In re CANNON BALL INDUSTRIES INC., BMC America, Inc., (Cons.) Debtors.

CANNON BALL INDUSTRIES INC., and BMC America, Inc., Plaintiff,

v.

SEQUA CORPORATION, Defendant.

Bankruptcy No. 89 B 31492.
Adv. No. 91 A 3126.

United States Bankruptcy Court,
N.D. Illinois, W.D.

Nov. 18, 1992.

James E. Stevens, Rockford, IL, Ronald R. Peterson, David M. Neff, Chicago, IL, for debtors, Cannon Ball Industries.

Robert W. Gettleman, Timothy R. Casey, Chicago, IL, Kim M. Casey, Rockford, IL,

David P. von Ebers, Chicago, IL, for defendant Sequa Corp.

## MEMORANDUM OPINION

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This matter comes before the Court on Cross–Motions for Summary Judgment arising from a Complaint under Section 547. Attorneys James E. Stevens, Ronald R. Peterson, and David M. Neff represent the Debtors, Cannon Ball Industries Inc. (Cannon Ball) and BMC America, Inc. (BMC). Attorneys Robert W. Gettleman, Timothy R. Casey, Kim M. Casey, and David P. von Ebers represent the Defendant, Sequa Corporation (Sequa).

## BACKGROUND

Cannon Ball and BMC are Illinois corporations engaged in the business of manufacturing and selling utility office furniture products, recreational vehicle accessories, garage doors and barn doors. Cannon Ball was formerly known as Starline Products, Inc. On or about September 9, 1982, Starline Products, Inc. executed a note in the principal amount of $750,000 to Chromalloy American Corporation (Chromalloy). Chromalloy is a subsidiary of Sequa. The note was secured by the Debtors' accounts receivable, inventory, notes receivable, chattel paper and other tangible personal property.

On that same day, the shareholders of Starline Products, Inc., Charles J. Fields, Roger Peterson and Orrin Kinney ("shareholders"), executed a guarantee of $150,-000 of the obligation of Starline Products, Inc. to Chromalloy.

On or about October 3, 1989, the Debtors filed separate petitions for relief under Chapter 11 of the Bankruptcy Code. Within one year prior to the filing of the Debtors' bankruptcy petitions, the Debtors made four payments to Sequa on the note, totalling $43,984.36. At the time of the bankruptcy petitions, there remained $400,-000 due and owing under the note.

The issue is whether the shareholders received a benefit which would render the payments avoidable as preferences under Section 547(b).

## DISCUSSION

Section 547 of the Bankruptcy Code provides in relevant part:

(b) ... the trustee may avoid a transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■ The purpose of this provision is to achieve equality of treatment among creditors similarly situated. This is accomplished by empowering the trustee with the right to recover certain payments or transfers of property which would enable the creditor to receive more than it would have otherwise. *In re C–L Cartage Co.*, 899 F.2d 1490, 1492 (6th Cir.1990).

■ The issue is one of first impression for the Court. In 1989, a landmark case, *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186 (7th Cir.1989) ("*Deprizio*") extended the preference period under Section 547 to one year for any loan which was guaranteed by an insider. Under *Deprizio*, a creditor who procured a guarantee from an insider could find that payments made within a year of bankruptcy are avoidable under Section 547. Other Circuit Courts

have concurred in this result.[1] The rationale is that a payment made to the creditor benefits the guarantor. As the Court pointed out,

> If insiders and outsiders had the same preference-recovery period, insiders who lent money to the firm could use their knowledge to advantage by paying their own loans preferentially, then putting off filing the petition in bankruptcy until the preference period had passed.

*Id.* at 1195.

In *Deprizio*, as here, the loan was guaranteed by the shareholders of the debtor and the payments were made within the appropriate time frame. Sequa argues, however, that since the shareholders only guaranteed up to $150,000 of the outstanding balance, the payments do not reduce their liability; that there remains a balance of $400,000 on the note; thus, there has not been a "benefit," as mandated by Section 547(b)(1). The question for the Court to resolve, then, is whether there is a benefit to the guarantor even if there is not an immediate, dollar-for-dollar economic gain.

██ The Court finds that there was a benefit received by the shareholders. The benefit does not have to be a direct, tangible, immediate benefit. As one author pointed out, an insider can benefit from payments made to a third party in many different ways.[2] Henk J. Brands, *Note: The Interplay Between Sections 547(b) and 550 of the Bankruptcy Code*, 89 Colum.L.Rev. 530, 531 (1989). The Court acknowledges that, in spite of the payments by the Debtors, the shareholders would have remained liable to the full extent of their guarantee. Nevertheless, a benefit was conferred. Indeed, after a certain point, it would have become a direct and tangible one. Initially the benefit was a

reduction in potential liability because each time a payment was made there was a reduction in the possibility that Segua would have to look to the shareholders for payment of the debt. With each payment the shareholders were brought one step closer to the direct reduction of their guarantee. Furthermore, with each payment the likelihood of the Debtor being able to make the remaining payments was increased. In an economic sense, the exposure or risk arising from the guarantee was diminished because the likelihood of guarantor liability was diminished. Simply put, each payment mathematically reduced the likelihood that the insiders would be called upon to fulfill their guarantee.

In addition, at a certain point the payments would have the effect of contributing to a direct reduction in the insiders' actual liability.[3] That point would be when the balance of the note reaches $193,984.36, which is the amount of the guarantee plus the payments at issue.

Consider a scenario in which the payments at issue had not been made to Sequa and the Debtor defaulted. At that time, if the balance due on the note is, say, $180,000, the shareholders would have to honor the entire guarantee of $150,000. But if the payments had been made, the balance would only be $136,015.64, and the shareholders would have been responsible for $13,984.36 less than if the payments had not been made. Thus, there would actually be a direct benefit from any point after the balance reaches $193,984.36. Every dollar paid thereafter would be a dollar less that the shareholders may have to pay.

As long as the payments provide a potential benefit that could arise subsequently, it can be said that a benefit is produced. The

---

**1.** *In re C–L Cartage, Inc.,* 899 F.2d at 1490; *In re Robinson Bros. Drilling, Inc.,* 892 F.2d 850 (10th Cir.1989).

**2.** For instance, similarly to *Deprizio*, the debtor could have collateral secured by two security interests. The junior security interest may have a guaranty from an insider. The insider benefits from payment to the holder of the senior security interest if such payment enhances the junior lien holder's prospects of satisfying the debt through foreclosure. Another example is

when an insider endorses the company's promissory note to its lender. When the note is eventually paid off, the insider benefits because he is no longer liable.

**3.** Here, the Court speaks prospectively from what is known as of the date of filing. Thereafter, Judge Moran issued his Order of February 25, 1992, in which the guarantors were required to pay a portion of the guarantee.

Code does not quantify the benefit that must be received; rather it merely makes avoidable a payment "... to or for the benefit of a creditor." 11 U.S.C. 547(b)(1). The Code does not require that the benefit be a direct, immediate and tangible one. Segua cites no cases so requiring.

Segua did argue, however, that the *Deprizio* court so limits its holding. This Court does not agree. The benefit in *Deprizio* could hardly be called immediate and tangible. In *Deprizio,* the debtor had borrowed money from many sources, including Ingersoll Rand Financial Corporation ("Ingersoll") and CIT Group/Equipment Financing, Inc. ("CIT"). Insiders of the firm, including the firms's president, guaranteed the debt to Ingersoll, but not to CIT. The Court held that the insider creditors received a benefit from payments to CIT because insiders had guaranteed debt secured by collateral in which CIT held a senior interest. *Levit v. Ingersoll Rand Financial Corp.,* 874 F.2d 1186 (7th Cir. 1989). The insiders in that case did not receive a direct benefit. The benefit was a reduction in the likelihood that the insiders would have to make good on the guarantee, because Ingersoll was now in a better position to satisfy the obligation through the collateral.[4] In addition, there is language in *Deprizio* which provides further support that the court did not contemplate restricting the definition of "benefit" in such a stringent manner: The court makes several references to the fact that "... every reduction in the debt to Lender reduces Guarantor's exposure," yet the court never limits that to an immediate dollar-for-dollar reduction in the guarantee. *Id.*

The Debtors cite *In re Erin Food Services, Inc.,* 140 B.R. 14 (Bankr.D.Mass.1991), in which the same issue was considered. In that case, Erin Food Services ("Erin") had loans to a creditor which were guaranteed by the property of one of its officers. The Trustee sought to recover interest payments made to the creditor within the preference period. The creditors argued that the payments did not yield a benefit be-

cause the value of the insider's collateral was less than the amount outstanding on the loan. Thus, even with the payments, the insider would lose his collateral. The court rejected the creditor's argument, holding that a transfer of property can be made "to or for the benefit of a creditor," even without an eventual real-dollar recovery on the part of the creditor. *Id.* at 18. The court further pointed out that "... a small reduction in contingent liability may produce a real dollar consequence in the end." *Id.* This Court agrees.

█ Finally, Segua argues that the state of mind of the insiders is relevant and that the only justification for applying the one year insider preference period to an outside creditor is when "... an insider purposefully and knowingly uses its position of control to pay off guaranteed obligations to its own benefit." Because the shareholders in this case allegedly had no idea that they would receive a benefit, Segua argues that *Deprizio* should not apply. Segua suggests that "Where the benefit received by the insider is hypothetical at best, and therefore less likely to motivate the insider to prefer one creditor over the others, the *Deprizio* rule should not apply."

The Court rejects that extension of *Deprizio.* The state of mind is not a factor in the Section 547 analysis. Whether the transfer was or was not done intentionally to benefit someone is not an element of a preferential transfer. What matters is whether the transfer conferred a benefit, not whether it was intended to do so. Here, it conferred a benefit. An avoidable preference has been proved.

---

**4.** The court did note that it would not expressly consider whether there was a benefit. Never-

theless, the court ultimately held the transaction to be an avoidable preference.